666 A.2d 529

IN THE MATTER OF ARTHUR ABBA GOLDBERG,
AN ATTORNEY AT LAW.

Argued June 20, 1995—Decided November 9, 1995.

*JoAnn G. Eyler,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*William J. Brennan, III,* argued the cause for respondent (*Smith, Stratton, Wise, Heher & Brennan,* attorneys; *Mr. Brennan* and *Thomas E. Hastings,* of counsel and on the brief).

PER CURIAM.

Pursuant to *Rule* 1:20–6(c)(2)(i), the Office of Attorney Ethics (OAE) filed a motion for final discipline of respondent, Arthur Abba Goldberg. The motion was based on two separate criminal convictions. In the United States District Court for the Central District of California, respondent pled guilty to three counts of mail fraud, in violation of 18 *U.S.C.A.* §§ 1341, 1343. In the United States District Court for the Southern District of Illinois, respondent pled guilty to one charge of conspiracy to defraud the United States, in violation of 18 *U.S.C.A.* § 371.

The Disciplinary Review Board (DRB) unanimously recommended disbarment. Respondent contended that the Court could not disbar him for intentional misconduct because he had pled guilty only to reckless authorization of improper disbursements and to use of the mails in connection with those disbursements. After oral argument, we remanded the matter to the DRB "for findings setting forth those facts conclusively presumed to exist because of the conviction itself...." We directed that the DRB should

> set forth any additional facts it may find by clear and convincing evidence that bear on the question of appropriate discipline, such facts to be based solely on the written record of the criminal proceedings, including transcripts of the plea proceedings, the contents of the plea agreements, and any documents the board finds respondent to have conceded as accurate, including presentence reports and sentencing memoranda....

Finally, we directed that "if either party wishes other evidence to be heard relating to those proposed findings, it shall move on notice to the board for an evidential hearing...."

The DRB requested respondent to produce the pre-sentence reports prepared in connection with his two guilty pleas. Respondent provided the reports. He did not present any other evidence.

On remand, the DRB again unanimously recommended disbarment. It concluded that respondent's criminal convictions clearly and convincingly demonstrated his participation in activities that reflected adversely on his honesty, trustworthiness, and fitness as a lawyer. In its Decision and Recommendation, the DRB stated: "It is clear that [respondent] has engaged in criminal conduct involving dishonesty and fraud, in violation of *DR* 1–102(A)(3) and superseding *RPC* 8.4(b) and (c)." We agree.

–I–

We begin with a summary of the relevant facts underlying respondent's guilty plea to three counts of mail fraud in the United States District Court for the Central District of California. Respondent was executive vice-president and a major stockholder

of Matthews & Wright, Inc., a New York underwriting firm. As executive vice-president, respondent directed Matthews & Wright's municipal underwriting activity. Matthews & Wright contracted with the Guam Economic Development Authority (GEDA) to underwrite $300 million worth of bonds. According to the United States Attorney, respondent and others at Matthews & Wright actually engaged in a fraudulent scheme. In its fifty-two-count indictment, the United States Attorney alleged that respondent had participated in bribery and deception to procure the issuance of $300 million worth of bonds to finance single-family housing in Guam. As a result of this fraudulent scheme, the GEDA's plan to finance the housing collapsed.

In exchange for underwriting the bonds, respondent and Matthews & Wright received a fee of $10.5 million. Matthews & Wright deposited $4.5 million in a trust fund known as the Program Development Fund (PDF). The PDF funds were for the development of multi-family housing in Guam. Two checks drawn on the PDF account formed the basis of respondent's convictions.

One check drawn in the amount of $30,000 was issued to Management & Development, the consulting company of Municipal Resources. The pre-sentence report states that respondent purportedly issued the check to Municipal Resources for reviewing a Federal Housing Authority credit-enhancement study that was to assist Guam developers. Respondent knew that Municipal Resources had not reviewed the study for the simple reason that the study did not exist. Respondent, nonetheless, approved the bogus bill sent by Municipal Resources. He then instructed Pittsburgh National Bank, the trustee for the PDF, to send a $30,000 check to Municipal Resources. The check was deposited in New American Federal Credit Union (NAFCU), a federal credit union formed by respondent and others for the ostensible purpose of making loans to emigres from Soviet Russia. Respondent was former president and chairman of the board of NAFCU. The pre-sentence report contends that respondent controlled the credit union through the NAFCU manager, Joel Schwartz.

Through Schwartz, the $30,000 was eventually transferred to respondent's associate, Frederick Mann, who directed the funds to the political campaign of the governor of Guam. At present, Mann is in Canada contesting extradition proceedings. The pre-sentence report also asserts that the $30,000 was actually a bribe to the Governor of Guam in exchange for supporting the bond issue.

To preclude the Internal Revenue Service (IRS) from attempt-ing to collect taxes from the bondholders, the GEDA agreed to a settlement that included payment of a large portion of the PDF to the IRS. In a civil suit brought by Guam, Matthews & Wright stipulated to the release of any claim it had to the monies remaining in the PDF.

In compliance with Federal Rules of Criminal Procedure, *Rule* 11(c) (*Rule* 11(c) statement), respondent stated the factual basis for his plea. He admitted:

Count 10 of the Indictment (mail fraud) charges that I caused the improper disbursement of funds amounting to $30,000 to Municipal Resources: Management & Development (Phillip J. Kieffer). I admit that the $30,000 disbursement was improper and was not for an appropriate purpose. I accept full responsibility for this act. I further admit that I knowingly caused matter to be delivered by mail and by the U.S. Postal Service in furtherance of the $30,000 disbursement. This offense occurred between April–May 1986.

The second PDF check was in the amount of $27,500 and was payable to Alpha Communications Ltd. (Alpha), a non-existent consulting company. Respondent approved the issuance of the check to Alpha for services that it never performed. In a false bill, Alpha stated that it had performed credit-enhancement ser-vices and computer work in connection with the development of the Guam bond program.

NAFCU also was involved in this payment. The pre-sentence report states that respondent personally benefited in this transac-tion. He needed to borrow $15,000 but did not want his wife to learn of this loan. Consequently, respondent directed a Matthews & Wright salesman to borrow $15,000 from NAFCU and covertly lend it to respondent. The salesman, Tony Romano, had bor-

rowed heavily from NAFCU. According to the pre-sentence report, Romano was financially obligated to respondent. Through NAFCU internal accounting procedures, the $15,000 was transferred from Romano's personal account to respondent.

Respondent repaid the $15,000 loan to Romano through the bogus bill issued by Alpha. The United States Attorney claims that respondent suggested to Romano that Romano set up Alpha and bill Matthews & Wright for non-existent consulting services. Consequently, Romano created Alpha and sent a $27,500 bill on Alpha letterhead to the Pittsburgh National Bank as trustee for the Guam PDF. Respondent authorized Pittsburgh National Bank to issue a $27,500 check to Alpha. The check was deposited in Alpha's account at NAFCU. On that same date, $15,000 was transferred out of the Alpha account to Romano's personal account to repay the $15,000 loan he had made to respondent.

In his *Rule* 11(c) statement, respondent also acknowledged:

Count 11 of the Indictment (mail fraud) charges that I caused the improper disbursement of funds amounting to $27,500 to Alpha Communications Ltd. (Anthony M. Romano). I admit that the $27,500 disbursement was improper and was not for an appropriate purpose. I accept full responsibility for the act. I further admit that I knowingly caused matter to be delivered by mail and by the U.S. Postal Service in furtherance of the $27,500 disbursement. This offense occurred between January—February 1986.

The third count charged that in furtherance of the PDF mail fraud, respondent caused a letter to be mailed to the GEDA on October 26, 1986. The letter deprived Guam of $57,500 deposited in the PDF. Respondent stated in his *Rule* 11(c) statement:

I admit the foregoing insofar as it relates to said unlawful disbursements from the PDF and acknowledge that in sending the letter described in Count 27, I caused a loss to Guam in the total amount of $57,500. I accept full responsibility for this act. I further admit that I knowingly caused matter to be delivered by mail and by the U.S. Postal Service in furtherance of such total disbursements of $57,500. This offense occurred on October 26, 1986.

In sum, respondent pled guilty to three counts of mail fraud.

On the basis of all the foregoing, and with respect to Counts 10, 100 and 27, I admit that I acted (i) with reckless indifference as to my right to cause the foregoing improper disbursements from the PDF, (ii) with reckless indifference as to the truth or falsity of the representations in said mailings, and (iii) with reckless

indifference as to Guam's legal and financial interests in said Fund with respect to the foregoing, thereby causing Guam to lose $57,500. I therefore committed mail fraud.

The court sentenced respondent to a term of eighteen months imprisonment, fined him $100,000, and ordered him to pay $127,-000 as partial restitution to the Territory of Guam.

In the Illinois matter, respondent pled guilty to conspiracy to commit an offense against the United States and to defraud the United States of and concerning its governmental functions and right, in violation of 18 *U.S.C.A.* § 371.

Respondent was involved in project financing for the riverfront area of East St. Louis, Illinois. Respondent and his underwriting firm of Matthews & Wright agreed to underwrite the issuance of $223,735,000 in escrow bonds for the development of a riverfront housing project. The bonds supposedly were issued on December 31, 1985, but were not validly issued until 1986. In 1986, Matthews & Wright received an underwriting fee of $8 million.

In the indictment, the United States alleged that respondent arranged to close the bond deal without the use of actual funds in order to avoid the anticipated effective date of unfavorable changes in the tax law regarding the treatment of arbitrage bonds. The effect of this sham transaction was that the check drawn by Matthews & Wright was returned to it and the bonds were "warehoused" with a shell bank, the Commercial Bank of the Americas, run by Frederick Mann. Because the bond closing was a "cashless closing," the bonds were not validly issued until 1986, after the effective change in the tax law. In sum, the indictment alleged that respondent participated in a conspiracy to ensure that the bonds were deemed issued on December 31, 1985, to take advantage of a favorable tax law related to arbitrage transactions.

Respondent stipulated to the following facts underlying his guilty plea:

From on or about November 15, 1985 and continuing thereafter until or about January 1, 1987, one or more employees of Matthews & Wright, including Arthur Goldberg, while acting within the scope of their employment, knowingly, willfully and unlawfully, did combine, conspire, confederate and agree with others to

impede, impair and interfere with the Internal Revenue Service in its lawful function of auditing tax matters. In furtherance thereof, the following overt acts were committed:

On or about October 8, 1985, Arthur Goldberg, on behalf of Matthews & Wright, sent through the United States mail a letter addressed to the City Attorney for the City of East St. Louis suggesting consideration of the issuance of bonds for an athletic facility and/or transportation facility.

Officials of the City of St. Louis and of Matthews & Wright failed to file informational returns with the IRS.

On April 21, 1986, Arthur Abba Goldberg spoke to City Attorney Sam Ross by telephone.

The court sentenced respondent to eighteen months imprisonment, to be served concurrently with the term imposed by the Central District of California. No other penalties were imposed. On August 4, 1989, following respondent's convictions, respondent was temporarily suspended from the practice of law in New Jersey, pursuant to *Rule* 1:20–6(b)(1).

–II–

A criminal conviction is conclusive evidence of respondent's guilt in disciplinary proceedings. *R.* 1:20–6(c)(i); *In re Goldberg*, 105 *N.J.* 278, 280, 520 *A.*2d 1147 (1987); *In re Tuso*, 104 *N.J.* 59, 61, 514 *A.*2d 1311 (1986); *In re Rosen*, 88 *N.J.* 1, 3, 438 *A.*2d 316 (1981). No independent examination of the underlying facts is necessary to ascertain guilt. *In re Bricker*, 90 *N.J.* 6, 10, 446 *A.*2d 1195 (1982). The only issue to be determined is the quantum of discipline to be imposed. *In re Goldberg, supra*, 105 *N.J.* at 280, 520 *A.*2d 1147. In determining the appropriate discipline, "the Court's goal is to protect the interests of the public and the bar while giving due consideration to the interests of the individual involved." *In re Litwin*, 104 *N.J.* 362, 365, 517 *A.*2d 378 (1986).

Although we strive for uniformity in the imposition of discipline, we judge each disciplinary proceeding on its own merits. The calculus for discipline includes: the nature and severity of the crime; whether the crime was related to the practice of law; and any mitigating factors, such as evidence of the attorney's good

reputation and character. *In re Kushner*, 101 *N.J.* 397, 400–01, 502 *A.2d* 32 (1986). In addition, the facts underlying a motion for final discipline based on a criminal conviction may be relevant to the nature of the discipline imposed. *In re Goldberg, supra,* 105 *N.J.* at 280, 520 *A.2d* 1147; *In re Kushner, supra,* 101 *N.J.* at 401, 502 *A.2d* 32. As we stated in *In re Spina,* 121 *N.J.* 378, 389, 580 *A.2d* 262 (1990):

> When, as here, the proceedings are initiated by a motion for final discipline based on a criminal conviction, the ethics authorities and this Court may be required to review any transcripts of a trial or plea and sentencing proceeding, pre-sentence report, and any other relevant documents in order to obtain the "full picture."

The uncontested pre-sentence reports and the sentencing hearings shed light on the totality of the circumstances surrounding respondent's guilty pleas.

In the California action, respondent admitted to "reckless indifference" in: (1) the authorization of improper disbursements from the PDF; (2) the truth or falsity of the representations in the mailings; and (3) Guam's legal and financial interest in the PDF. The pre-sentence report further indicates that respondent's misconduct, in addition to being reckless, was knowingly and willfully dishonest. The report concludes that respondent authorized a check to Municipal Resources for services that respondent knew had not been rendered. Respondent's *Rule* 11(c) statement admits that the disbursement was "improper" and was not for an "appropriate purpose." His authorization of the check to Alpha also implicated dishonest conduct. Respondent knew that Alpha had issued a bogus bill to the PDF and knowingly approved payment of the bogus bill.

Additionally, at respondent's sentencing hearing, the sentencing judge concluded that "it is very clear that although the defendant has only pleaded guilty to three counts of mail fraud ... there has been a conspiracy here of considerable magnitude, which has involved a lot of money, and has deprived a lot of people of some value."

In the Illinois action, respondent's own *Rule* 11(c) statement provides clear and convincing evidence of his dishonest and fraud-

ulent conduct. *Rule of Professional Conduct* 8.4(c) states that it is professional misconduct for an attorney to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." Respondent admitted in his *Rule* 11(c) statement that he "knowingly and willfully" conspired to interfere with the IRS.

Criminal convictions for conspiracy to commit a variety of crimes, such as bribery and official misconduct, as well as an assortment of crimes related to theft by deception and fraud, ordinarily result in disbarment. *In re Baldino,* 105 *N.J.* 453, 456, 522 *A.*2d 998 (1987); *In re Conway,* 107 *N.J.* 168, 182–83, 526 *A.*2d 658 (1987); *In re Surgent,* 104 *N.J.* 566, 569–70, 518 *A.*2d 215 (1986); *In re Huber,* 101 *N.J.* 1, 4–5, 499 *A.*2d 220 (1985). We have emphasized that when a criminal conspiracy evidences "continuing and prolonged, rather than episodic, involvement in crime," is "motivated by personal greed," and involved the use of the lawyers' skills "to assist in the engineering of the criminal scheme," the offense merits disbarment. *In re Goldberg, supra,* 105 *N.J.* at 283, 520 *A.*2d 1147; *see also In re Lunetta,* 118 *N.J.* 443, 449, 572 *A.*2d 586 (1989) (disbarring attorney involved in "protracted criminal conspiracy ... to receive and sell stolen securities"); *In re Alosio,* 99 *N.J.* 84, 87, 90, 491 *A.*2d 628 (1985) (disbarring attorney who organized scheme involving sale of stolen cars after guilty plea to one count of presenting false insurance claim and six counts of receiving stolen property). As we have stated, such conspiracies pose a "direct threat to society," mandating disbarment "to preserve the integrity of the bar." *In re Goldberg, supra,* 105 *N.J.* at 283, 520 *A.*2d 1147.

We have even disbarred an attorney who had been acquitted of all criminal charges, including a charge of conspiracy. *In re Rigolosi,* 107 *N.J.* 192, 211, 526 *A.*2d 670 (1987). Notwithstanding the jury verdict in that case, we concluded that the record clearly and convincingly established that the attorney's conduct involving dishonesty, fraud, and deceit reflected his unfitness to practice law.

In the present case, clear and convincing evidence supports disbarment. Respondent's argument that his conduct was neither knowing nor willful is specious. The Illinois criminal-conspiracy conviction clearly demonstrates his purposeful illegal conduct. Moreover, the pre-sentence report in the California action amply illustrates respondent's knowingly dishonest acts. As we have said, "it is appropriate ... to examine the totality of circumstances, including the details of the offense, the background of respondent, and the pre-sentence report in reaching an appropriate decision that gives due consideration to the interests of the attorney involved and to the protection of the public." *In re Spina, supra*, 121 *N.J.* at 389, 580 *A.2d* 262.

At both the original hearing before the DRB and again on remand, respondent had the opportunity to dispel the inference that he was the principal actor in two major frauds. On both occasions, respondent elected to remain silent. In light of the acknowledged facts about his participation in the fraudulent schemes, his silence is resounding.

We are aware of respondent's active involvement in community service and his efforts to resettle numerous immigrants from the former Soviet Union and Eastern Europe. We also note receipt of numerous character references on respondent's behalf. Nonetheless, respondent's conscious participation in the illegal activities leading to his criminal convictions outweighs these mitigating factors.

Lastly, although respondent's conduct and criminal convictions did not relate directly to the practice of law, we have consistently held that "an attorney is obligated to adhere to the high standards of conduct required of a member of the bar even though his activities did not involve the practice of law." *In re Huber, supra*, 101 *N.J.* at 4, 499 *A.2d* 220; *In re Suchanoff*, 93 *N.J.* 226, 230–31, 460 *A.2d* 642 (1983).

We are in complete accord with the unanimous recommendation of the DRB that respondent should be disbarred. We direct

respondent to reimburse the Disciplinary Oversight Committee for appropriate administrative costs, including the costs of transcripts.

*For Disbarment*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN—7.

*Opposed*—None.

## ORDER

It is ORDERED that ARTHUR ABBA GOLDBERG of LONG BRANCH, who was admitted to the bar of this State in 1965, and who was thereafter temporarily suspended from practice by Order of this Court on August 4, 1989, and who remains suspended at this time, be disbarred, effective immediately, and his name be stricken from the roll of attorneys of this State; and it is further

ORDERED that all funds, if any, currently existing in any New Jersey financial institution maintained by ARTHUR ABBA GOLDBERG, pursuant to *Rule* 1:21-6 be restrained from disbursement except on application to this Court, for good cause shown, and shall be transferred by the financial institution to the Clerk of the Superior Court, who is directed to deposit the funds in the Superior Court Trust Fund, pending further Order of this Court; and it is further

ORDERED that ARTHUR ABBA GOLDBERG comply with *Rule* 1:20-20 dealing with disbarred attorneys; and it is further

ORDERED that ARTHUR ABBA GOLDBERG reimburse the Disciplinary Oversight Committee for appropriate administrative costs, including the cost of transcripts.